INDEPENDENT LIFE INSURANCE CO. OF AMERICA, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 25295.   Promulgated October 4, 1929.

758

*James A. Newman, Esq.*, for the petitioner.
*E. C. Lake, Esq.*, for the respondent.

OPINION.

STERNHAGEN : The Commissioner notified petitioner of a determination of deficiencies in income tax of $298.97 for 1923 and $1,115.65 for 1924. Petitioner attacks this determination as contrary to the Revenue Act of 1921, sections 242 *et seq.*, and similar sections of the Revenue Act of 1924, and, if necessary, contrary to the Constitution.

The facts are presented in the following stipulation:

It is hereby stipulated and agreed by and between the parties to the above entitled appeal, by their respective counsel:

(1) That the petitioner, Independent Life Insurance Company of America, is a life insurance company, with its home office located at Nashville, Tennessee.

(2) That on January 25, 1927, the respondent mailed to the petitioner a notice of deficiency, showing proposed deficiencies for the calendar years 1923 and 1924 in the amounts of $298.97 and $1,115.65, respectively. A copy of said notice of deficiency is attached hereto as Exhibit A, if being agreed that the book value of petitioner's building for the years 1923 and 1924 and the amounts shown therein as rents received from other tenants covering space occupied by others than the Company, are correct and the facts in this case.

(3) That during the years 1923 and 1924, the petitioner owned a twelve story building located in the city of Nashville, Tennessee. The petitioner in 1923 and 1924 occupied about one story of said building as its home office and rented such portions of the remainder of the building as it was able to secure tenants for.

EXHIBIT A

JAN. 25, 1927.

INDEPENDENT LIFE INSURANCE COMPANY,
    *Independent Life Building,*
        *Corner Fourth and Church Streets, Nashville, Tennessee.*

SIRS : The determination of your income tax liability for the years 1923 and 1924, as set forth in office letter dated October 30, 1926, has been changed as the result of your letter dated November 26, 1926, to disclose a deficiency in tax amounting to $1,414.62, as shown in the attached statement.

STATEMENT

IT:CA:2553-9-60D

In re: Independent Life Insurance Company
  Independent Life Building,
  Corner Fourth and Church Streets,
  Nashville, Tennessee.

| Year | Deficiency in Tax |
|---|---|
| 1923 | $298. 97 |
| 1924 | 1, 115. 65 |
| Total | 1, 414. 62 |

### 1923

Income:

| | |
|---|---|
| Interest from all sources | $19, 704. 81 |
| Rents | 88, 405. 18 |
| Gross income | 108, 109. 99 |

Deductions:

| | | |
|---|---|---|
| Interest exempt | $1, 948. 32 | |
| Excess of 4% of mean of reserve over exempt interest | 20, 363. 33 | |
| Investment expenses | 1, 946. 00 | |
| Taxes | 11, 147. 72 | |
| Other real estate expenses | 51, 357. 46 | |
| Depreciation | 7, 500. 00 | |
| Interest | 8, 552. 48 | |
| Total deductions | | 102, 815. 31 |
| Adjusted net income | | 5, 294. 68 |

In connection with the above adjustment of gross income with respect to rents, your attention is invited to Article 686, Regulations 62, which reads in part as follows:

"No deduction shall be made for any taxes, expenses, or depreciation on account of any real estate owned or occupied in whole or in part by a life insurance company unless there is included in the return of gross income the rental value of the space so occupied, such rental value shall not be less than a sum which in addition to any rents received from other tenants shall provide a net income (after deducting taxes, depreciation and other expenses) at the rate of 4 per cent per annum of the book value at the end of the taxable year on the real estate so owned and occupied."

| | | | |
|---|---|---|---|
| Book value of home office | | | $460, 000. 00 |
| Rents received from other tenants | | $73, 620. 48 | |
| Less: | | | |
| Expenses | $51, 357. 46 | | |
| Taxes (on R. E.) | 11, 147. 72 | | |
| Depreciation | 7, 500. 00 | | |
| | | 70, 005. 18 | |
| | | 3, 615. 30 | |
| Less: 4% of $460,000.00 | | 18, 400. 00 | |
| Value of space owned and occupied by company to be included in gross income | | | 14, 784. 70 |

Rents from other tenants in building in which company occupied
space _____ $73,620.48

Total rents to be reported in gross income _____ 88,405.18

You are advised that the amount, $11,376.81, representing permanent improvements, has been eliminated from expenses in accordance with Section 245 (a) (6) of the Revenue Act of 1921.

*Computation of tax*

Net Income _____ $5,294.68
Less: Exemption _____ 2,000.00

Taxable at 12½% _____ 3,294.68
Tax at 12½% _____ $411.83
Previously assessed _____ 112.86

Deficiency in tax _____ 298.97

## 1924

Income:

Interest from all sources _____ 20,519.85
Rents _____ 105,689.29

Gross income BS:3 _____ 126,209.14

Deductions:

Interest exempt _____ $1,687.81
Excess of 4% of mean of reserve over exempt interest 22,773.76
Investment expenses _____ 2,220.34
Taxes _____ 11,147.00
Other real estate expenses _____ 67,271.97
Depreciation _____ 7,500.00
Interest _____ 868.69

Total deductions _____ 113,469.57

Adusted net income _____ 12,739.57

The adjustment for rents is made for the same reason as given in 1923. The computation is as follows:

Book value of home office _____ $494,257.97
Rents received from other tenants _____ $71,289.21
Less:

Expenses _____ $67,271.97
Taxes (on R. E.) _____ 11,147.00
Depreciation _____ 7,500.00
                                            85,918.97

                                            14,629.76
Add: 4% of $494,257.97 _____ 19,770.32

Value of space owned and occupied by company to be included in
gross income _____ 34,400.08
Rents from other tenants in building in which company occupied
space _____ 71,289.21

Total rents to be included in gross income _____ 105,689.29

*Computation of tax*

| | |
|---|---:|
| Net income | $12, 739. 57 |
| Less: Exemption | 2, 000. 00 |
| Taxable at 12½% | 10, 739. 57 |
| Tax at 12½% | 1, 342. 44 |
| Previously assessed | 226. 79 |
| Deficiency in tax | 1, 115. 65 |

Your return for the year 1922 has been closed, showing no tax liability.

You are advised that the contentions contained in your letter dated November 26, 1926, have been allowed with the exception of permanent improvements included in expenses for 1923.

Payment of the tax should not be made until a bill is received from the Collector of Internal Revenue for your district, and remittance should then be made to him.

Insurance companies, including domestic life companies, are subject to a special method of income tax which is set forth in Title II, Revenue Acts of 1921 and 1924, beginning with section 242. *National Life Insurance Co.* v. *United States*, 277 U. S. 508; *Metropolitan Life Insurance Co.*, 8 B. T. A. 938; *John Hancock Mutual Life Insurance Co.*, 10 B. T. A. 836; *Midland National Life Insurance Co.*, 14 B. T. A. 200.[1]

---

[1] An explanation of the special scheme is found in the testimony on September 6, 1921, of Dr. Thomas S. Adams, tax adviser, Treasury Department, before the Senate Committee on Finance, 67th Congress, during its consideration of H. R. 8245, which became the Revenue Act of 1921. Hearings, pages 83 to 95, inclusive. The Report of the House Committee on Ways and Means is as follows:

LIFE INSURANCE COMPANIES.

Sections 242–246: The provisions of the present law applicable to life insurance companies are imperfect and productive of constant litigation. Moreover, the taxes paid by life insurance companies under the income tax are inadequate. It is accordingly proposed in lieu of all other taxes to tax life insurance companies on the basis of their investment income from interest, dividends, and rents, with suitable deductions for expenses fairly chargeable against such investment income. The new tax would yield a larger revenue than the taxes which it is proposed to replace.

The Report of the Senate Committee on Finance is as follows:

TAXES ON LIFE INSURANCE COMPANIES.

Sections 242–246 provide a new plan for the taxation of life insurance companies, substantially similar to the plan embodied in the revenue act of 1918 as first adopted by the Senate. The provisions of the present law applicable to life insurance companies are imperfect and productive of constant litigation. The proposed plan would tax life insurance companies on the basis of their investment income from interest, dividends, and rents, with suitable deductions for expenses fairly chargeable against such investment income. The new tax would take the place of the present income and excess-profits taxes for the year 1921, and life insurance companies would share with other insurance companies in the repeal in the year 1922 of the capital stock tax and the taxes imposed by section 503. The new tax will yield a larger revenue than the taxes which it is proposed to replace.

See also Holmes, Federal Taxes, Sixth Edition, p. 317, et seq.; Montgomery, Income Tax Procedure. 1927, ch. 44; Foulke, The Federal Income Tax, ch. 38.

The principal characteristic of this special method is that, instead of defining gross income broadly, as is done in section 233 in respect of other corporations generally, it adopts a special definition which includes only so-called " investment income " consisting of interest, dividends, and rents, and excludes all other income, such as premium receipts and profits from sales of securities or other assets. The tax is levied at the same percentage of defined net income as is applied by section 230 to other corporations. Net income is defined as gross income less specified items described in nine subdivisions of section 245, subsection (a). Of these deductions, only (6) and (7) are important in this proceeding; and the material parts thereof, together with subsection 245 (b), are as follows:

(6) Taxes and other expenses paid during the taxable year exclusively upon or with respect to the real estate owned by the company, not including taxes assessed against local benefits of a kind tending to increase the value of the property assessed, and not including any amount paid out for new buildings, or for permanent improvements or betterments made to increase the value of any property. * * *

(7) A reasonable allowance for the exhaustion, wear and tear of property, including a reasonable allowance for obsolescence. * * *

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(b) No deduction shall be made under paragraphs (6) and (7) of subdivision (a) on account of any real estate owned and occupied in whole or in part by a life insurance company unless there is included in the return of gross income the rental value of the space so occupied. Such rental value shall be not less than a sum which in addition to any rents received from other tenants shall provide a net income (after deducting taxes, depreciation, and all other expenses) at the rate of 4 per centum per annum of the book value at the end of the taxable year of the real estate so owned or occupied.

Regulations 62, under the Revenue Act of 1921, and Regulations 65, under the Revenue Act of 1924, contain the following article:

ART. 686. *Home office properties.*—No deduction shall be made for any taxes, expenses, or depreciation on account of any real estate owned and occupied in whole or in part by a life insurance company unless there is included in the return of gross income the rental value of the space so occupied. Such rental value shall not be less than a sum which in addition to any rents received from the other tenants shall provide a net income (after deducting taxes, depreciation, and other expenses) at the rate of 4 per cent per annum of the book value at the end of the taxable year of the real estate so owned and occupied. For example, if the book value of a parcel of real estate owned and occupied in whole or in part by the company is $1,000,000, the rents received from other tenants $30,000, taxes and expenses $40,000, and depreciation $20,000, the company would have to include in its gross income a sum not less than $70,000 ($40,000 taxes and expenses, plus $20,000 depreciation, minus $30,000 rents from tenants, plus 4 per cent of $1,000,000) as the rental value of the space occupied by it in order to avail itself of the deductions of $40,000 and $20,000. In any case the rents received from other tenants must be included in gross income.

The petitioner claimed and was allowed deductions under (6) and (7) in respect of the entire building which it owned and in part occupied, and there has been no dispute as to the amounts of the deductions. For 1923 they aggregated $70,005.18 and for 1924, $85,918.97. Nor is it disputed that, within the meaning of subsection (b), the book value of the entire building was, at the end of 1923, $460,000, and 1924, $494,257.97, of which 4 per cent is $18,400 and $19,770.32, respectively. The gross rents received from other tenants were $73,620.48 and $71,289.21, respectively. Neither the rental value nor the book value of the space occupied by petitioner is in evidence, and it can not be inferred, as petitioner suggests, that the amount is one-twelfth of the stipulated book value.

The respondent's method of computing the figure to be included in gross income under subsection (b) to support any deduction under (6) and (7) is based upon the assumption that the statute required a minimum net rent of 4 per cent of the book value of the entire building. In order to arrive at this figure he includes as rental value of the space occupied by petitioner, $14,784.70 for 1923 and $34,400.08 for 1924. The petitioner insists that such figures are not in accordance with the statute and that the error lies in assuming that the 4 per cent minimum provided by the last sentence of section 245 (b) is computed upon the book value of the entire building. The contention is that the statutes " provide that the sum to be returned as rents for the space so occupied, is 4 per cent of the book value of such space at the end of the taxable year." The method thus urged by petitioner is to add to rents actually received (less taxes, depreciation, and expenses) an amount equal to 4 per cent of the book value of the space occupied by it.[1] Since such book value

---

[1] If we were to adopt petitioner's suggestion that book value of space occupied is one-twelfth of the stipulated book value of the entire building, petitioner's method would be for 1923 to add to ($73,620.48 less $70,005.18 or $3,615.30) an assumed rental value of (4% of 1/12 of $460,000 or $1,533.33). Thus the rent from the entire building would be taken to be

| | |
|---|---:|
| Rent actually received | $73,620.48 |
| Rental value of space occupied | 1,533.33 |
| Gross rent | 75,153.81 |
| Deductions | 70,005.18 |
| Net rent taxed | 5,148.63 |

Instead of which respondent's method arrives at $18,400 or 4% of the book value of the building.

For 1924 petitioner would add to ($71,289.21 less $85,918.17 or minus $14,628.96) an assumed rental of (4% of 1/12 of $494,257.97 or $1,647.52). The rent from the building would thus be

| | |
|---|---:|
| Rent actually received | $71,289.21 |
| Rental value of space occupied | 1,647.52 |
| Gross rent | 72,936.73 |
| Deductions | 85,918.17 |
| | 12,981.44 |

Respondent takes $19,770.32 as net rent.

is not in evidence, petitioner would fail, even if its construction of the statute were correct. But, in our opinion, such construction is without support in either the terms or the theory of the statute. The respondent's method fulfills the clear legislative purpose and is consistent with the context.

The primary purpose of subsection (b) is to correlate gross income from real estate with deductions from real estate. Since deductions are allowed as to the entire building, gross income is likewise computed. To apply depreciation, taxes, and expenses of the entire building against rents received from part would be a distortion. The obvious purpose of augmenting rents actually received by rental value of space occupied was to effect a symmetry. The 4 per cent minimum was an aid in arriving at a figure to be used as net rent from the entire building. It would assure a net rent great enough to justify the deductions permitted, and reduce controversy as to actual rental value.

The construction urged by petitioner is in effect that rental value of the space occupied should be not less than 4 per cent of the book value thereof. Had this been meant, it could have been so simply stated that we can not believe Congress would have used a locution so much more complicated. While the closing words " owned or occupied " are grammatically somewhat obscure, they may fairly be read in consonance with the plain intendment of the statue as above set forth.

It is our opinion, therefore, that respondent has correctly construed the statute and that the deficiencies determined are in accordance therewith.

The petitioner contends that this construction of the statute renders it unconstitutional, and urges that such a result will be avoided by adopting its own construction, as above described. There is, of course, a well recognized doctrine that doubtful statutory construction. involving possible unconstitutionality should always be rejected in favor of a reasonable construction by which the constitutional conflict can be avoided. *United States* v. *Delaware & Hudson Co.*, 231 U. S. 266; *Lucas* v. *Alexander*, 279 U. S. 573. But we do not understand this to require an interpretation of the statute which seems clearly at variance with the plan and purpose indicated by the plain meaning of the language used. So long as there seems to us to be no ambiguity in the statute, we are constrained to apply it according to its tenor and terms, and not to strain it into a strange meaning in order to avoid an attack of unconstitutionality. That would be to rewrite the law and substitute for the plain legislation adopted by Congress after deliberation a more subtle design not contemplated, or perhaps purposely rejected. The Board's power of

interpretation does not include such a function. Furthermore, if the statute is unconstitutional as contended, the petitioner's construction does not save it. The weakness alleged to be inherent is, as will be hereafter seen, equally applicable under either construction. For if the attempted inclusion in income of rental value of space occupied by the owner and its computation at a percentage minimum, as prescribed, are contrary to the Constitution, this must be no less so when petitioner's method is used resulting in a smaller minimum than under respondent's method resulting in a greater. In either case, it is the inclusion of rental value, actual or minimum, upon which the attack centers under the Constitution.

Respondent insists that the statute is not in violation of the Constitution and that the Board should on the merits decide it to be valid. We are therefore confronted squarely with the opposing contentions, and we see no reason why we should refrain from considering them and deciding on this ground whether the deficiency determined by the Commissioner is lawfully due from petitioner.

The petitioner contends that the act purports to impose an income tax upon rental value, that this is not income, that the effect is to impose a direct tax without apportionment, and that this is as much so when the method used is to allow deductions upon condition that gross income shall contain improper inclusions as it would be if the tax were in all instances expressly based on items not income; further, that the minimum required to be returned as income from the building and the method of arriving at it by the mathematical formula contained in the second sentence of section 245 (b) are invalid as having no relation to income.

That the tax was intended to be an income tax is plain. The statute in which it is found contains numerous titles. Title II is called income tax and purports to impose the income tax and, except for general administrative provisions, to contain all the provisions relating thereto. More specifically, the insurance sections expressly impose a tax on income, in lieu of the general corporation income tax of section 230, and define the " net income " which is the subject of the tax. Other titles and other sections impose the profits tax and various excise taxes. It seems entirely proper, therefore, to judge this tax by the standards of an income tax under the Sixteenth Amendment, cf. *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, and not to lift it into some other category with tests more liberal or strict than those which presumably were intended to be applied. In *Pollock* v. *Farmers Loan & Trust Co.*, 157 U. S. 429; 158 U. S. 601; *Eisner* v. *Macomber*, 252 U. S. 189; and *National Life Insurance Co.* v. *United States*, 277 U. S. 508, the Supreme Court made it clear that a tax which, when judged by its own terms, was contrary

in effect to the requirements of the Constitution, would be condemned. The inclusion of stock dividends in gross income was held in *Eisner* v. *Macomber*, *supra*, to result in direct tax and was condemned for want of apportionment; and the court did not find it necessary to inquire whether there was any way of saving it by calling it an excise tax subject only to geographical uniformity. And in the *National Life Insurance Co.* case, *supra*, the court rejected the argument contained in the briefs of counsel that the very tax on insurance companies now at bar was in truth an excise tax and as such not open to attack. See also *Spraeckels* v. *McClain*, 192 U. S. 397.

Respondent suggests, however, that since Congress has not measured the tax by using all of petitioner's income, such as premium receipts or sales profits, as it might have done, petitioner could only complain by showing that the tax now determined for assessment is greater in amount than it would have been if Congress had used its power to the full extent. The argument is in effect the same as saying that since Congress might have established a percentage rate of tax of 50 per cent instead of the 12½ per cent used, no one may complain if by including in gross income exempt items like stock dividends or tax-exempt interest, he is only taxed at a rate of 40 per cent. By defining statutory gross income to include only interest, dividends, and rents, the intention was disclosed to omit all other factors from consideration. *National Life Insurance Co.* v. *United States*, *supra*. The effect otherwise would be to include premium receipts in gross income to the uncertain extent necessary to make up in each case for items improperly included, such as interest from State securities, or capital property like stock dividends, and thus to defeat the manifest legislative purpose to leave premium receipts entirely out of the income taxed. Thus to Congress would be ascribed the recondite purpose of ostensibly releasing premiums from tax while actually requiring them to be used to validate particular taxes which would otherwise invade constitutional rights. We reject this and treat the statute as candidly expressing its design and purpose. "The plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364. Looking, therefore, at the statute before us in the light in which it was enacted, that of an income tax, and its purpose to tax only income found in interest, dividends and rents, we examine it to see whether it has mistakenly employed means to bring about an effect prohibited by the Constitution.

In respondent's determination for 1924, it appears that the taxes, expenses and depreciation amounted to $85,918.97 while the rents

actually received were $71,289.21, thus showing a financial loss of $14,629.76. Whether there would be a loss if the income derived from the business conducted by petitioner in the space were reckoned in the computation is unknown, but since the statute expressly leaves such income out of the equation we may not inquire. The loss is required to be overcome by the treatment as gross income of rental value of the space occupied, and a hypothetical rental value computed upon a mathematical formula is to be used as a minimum irrespective of its remoteness from value in fact. The formula prescribed brings about a rental value of space occupied which varies inversely with the actual rents received from the comparable space rented. The entire net rent is in any event to be taken at 4 per cent of book value; the rents received and deductions are factually certain, hence the rental value of space occupied must always be such a figure as happens to be needed to make up the 4 per cent minimum. Thus when the net rent received is low, the hypothetical rental value of space occupied is high, and *vice versa;* although the converse is not true if the taxpayer's actual rental value is greater than the figure used to make up the 4 per cent minimum. In the present case, the taxpayer occupied about one out of twelve stories. For 1923 it received actual rents of $73,620.48 for eleven stories, the expenses, taxes and depreciation were $70,005.18, and the one story occupied was consequently valued at $14,784.70 in order to arrive at the minimum 4 per cent of the book value of $460,000. For 1924, rents received dropped to $71,289.21, expenses increased to $85,918.97, and the one story was consequently valued at $34,400.08 (more than double the 1923 figure) to maintain the 4 per cent of book value of $494, 257.97.

The petitioner insists that this illustrates an attempt to tax as income a figure which is not income and which has no reasonable relation to income. This contention affects only the validity of the use of a purely mathematical rental value and of the particular method prescribed in the second sentence of section 245 (b) to arrive at a figure to be used in lieu of the actual rental value. The suggestion also arises that since " book value " has no necessary relation to actual value, *Virginia* v. *West Virginia,* 238 U. S. 202, a percentage based thereon to arrive at a minimum rental value has no relation to income. But the more sweeping objection is that by requiring that rental value be included in gross income in order to permit the deductions, a direct tax has been laid without apportionment upon something other than income, and that this is contrary to Article I, Section 9, of the Constitution and not within the Sixteenth Amendment.

Notwithstanding the tremendous weight of the presumption of constitutional validity to be attributed to this, as to all other acts of

Congress, and the consequent disposition of the Board to consider with skepticism any argument with which it is attacked, we can find no reasonable escape from the conclusion that the act conflicts with the Constitution and that the deficiency can not be sustained.

In *Pollock* v. *Farmers Loan & Trust Co.*, 157 U. S. 429; 158 U. S. 601, it was taken as beyond argument that a tax upon real property by reason of its ownership and based upon its value was a direct tax requiring apportionment, as it has been said to be from the beginning of the Government. *Hylton* v. *United States*, 3 Dall. 171; *Veazie Bank* v. *Fenno*, 8 Wall. 533; *Scholey* v. *Rew*, 23 Wall. 331; *Springer* v. *United States*, 102 U. S. 586. It was upon this as an axiom that it was decided in the *Pollock* case that the tax on income from real estate in the form of rents was so truly a tax on the real estate itself as to be likewise a direct tax, at that time requiring apportionment. In the first opinion in the *Pollock* case, the court said:

\* \* \* The real question is, is there any basis upon which to rest the contention that real estate belongs to one of the two great classes of taxes, and the rent or income which is the incident of its ownership belongs to the other? We are unable to perceive any ground for the alleged distinction. An annual tax upon the annual value or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would be paid out of the rent or income. This law taxes the income received from land and the growth or produce of the land. Mr. Justice Paterson observed in Hylton's Case, "land, independently of its produce, is of no value," and certainly had no thought that direct taxes were confined to unproductive land.

In the second opinion appears the following:

The Constitution prohibits any direct tax, unless in proportion to numbers as ascertained by the census, and, in the light of the circumstances to which we have referred, is it not an evasion of that prohibition to hold that a general unapportioned tax, imposed upon all property owners as a body for or in respect of their property, is not direct, in the meaning of the Constitution, because confined to the income therefrom?

Whatever the speculative views of political economists or revenue reformers may be, can it be properly held that the Constitution, taken in its plain and obvious sense, and with due regard to the circumstances attending the formation of the Government, authorizes a general unapportioned tax on the products of the farm and the rents of real estate, although imposed merely because of ownership, and with no possible means of escape from payment, as belonging to a totally different class from that which includes the property from whence the income proceeds?

There can be but one answer, unless the constitutional restriction is to be treated as utterly illusory and futile, and the object of its framers defeated. We find it impossible to hold that a fundamental requisition deemed so important as to be enforced by two provisions, one affirmative and one negative, can be refined away by forced distinctions between that which gives value to property and the property itself.

Whatever may be said about the nature under the Constitution of a tax upon income derived from sources other than real estate,

an inquiry not required by the present case, there is little ground for doubt that a tax on real estate is a direct tax, and that a tax on the income therefrom was held to be equally so. Cf. *Brushaber* v. *Union Pacific Railroad Co.*, 240 U. S. 1. Before the Sixteenth Amendment, both were said in the *Pollock* case to have required apportionment; and the effect of the Amendment was that the tax on income alone was freed from such apportionment, the tax on the real estate being still left subject to Article I, Section 9. *Peck* v. *Lowe*, 247 U. S. 165; *Eisner* v. *Macomber*, 252 U. S. 189; *Evans* v. *Gore*, 253 U. S. 245. The Amendment " confers no power upon Congress to define and tax as income without apportionment something which theretofore could not have been properly regarded as income," *Taft* v. *Bowers*, 278 U. S. 470.

Thus the only theory upon which a tax on the rental value of real estate occupied by the owner could be laid without apportionment would be that such rental value is income within the legal signification of that term as used in the Sixteenth Amendment. That it may be sometimes regarded as income by economists, some of whom may use the term as applying to benefits or enjoyments, is not controlling, *Lynch* v. *Turrish*, 247 U. S. 221; *Merchants Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509. Nor may we look to the use and meaning of the word income found in statutes of several of the States, for the same constitutional requirements do not exist to give force to the limitations of definition. Here the restriction upon Congress is that it may not use or define the term so as to bring about an unapportioned direct tax, and no authority can be attached to a usage free from a similar restriction. The English usage to exclude profits from capital sales was disregarded in *Merchants Loan & Trust Co.* v. *Smietanka*, *supra;* and the Massachusetts usage to include stock dividends was disregarded in *Eisner* v. *Macomber*, *supra.* In the 1894 Act, which was the precursor of the Sixteenth Amendment, rents were included, but no reference was made to rental value, and as we have seen, the *Pollock* case took as a postulate that the use and value of realty was the realty itself rather than the income therefrom. The Corporation Excise Tax Act of 1909 used income in the same sense as a measure of excise tax, *Flint* v. *Stone Tracy Co.*, 220 U. S. 107. Therefore there is nothing in the history immediately preceding the Sixteenth Amendment to give support to a more expansive use of the word income than that considered in the *Pollock* case. And clearly nothing can be said for treating rents—which indubitably are income—as including rental value of space owned and occupied. Rent has since feudal times implied two separate persons and estates, those of landlord and tenant, and it would be a misnomer to apply it to the value of a

landlord's use and occupancy of his own property. Thompson on Real Property; Tiffany on Real Property; 36 Corpus Juris 285. See, also, *Duffy* v. *Central R. R.*, 268 U. S. 55.

It seems to us furthermore that a construction of income to include rental value of occupancy of realty by its owner would be to narrow the force of the requirement of apportionment to a point of practical nullification.

A proper regard for its genesis, as well as its very clear language, requires also that this amendment shall not be extended by loose construction, so as to repeal or modify, except as applied to income, those provisions of the Constitution that require an apportionment according to population for direct taxes upon property, real and personal. This limitation still has an appropriate and important function, and is not to be over-ridden by Congress or disregarded by the courts. (*Eisner* v. *Macomber*, 252 U. S. 189, 206.)

Since, as we have seen, to tax the use or value of realty as distinguished from rents or profits is to tax the realty itself, it would result that although the requirement of apportionment would nominally remain applicable to a tax imposed *eo nomine* upon the realty itself, still a tax in the same measure upon rental value of realty occupied by the owner would escape apportionment. The speciousness of such a differentiation is obvious.

If it be true that by varying the form the substance may be changed, it is not easy to see that anything would remain of the limitations of the Constitution, or of the rule of taxation and representation, so carefully recognized and guarded in favor of the citizens of each state. But constitutional provisions can not be thus evaded. * * * (*Pollock* v. *Farmers Loan & Trust Co.*, 157 U. S. 429, 581.)

The use and meaning of the word income at the time of its incorporation in the Sixteenth Amendment has been considered by the Supreme Court in several cases since the Amendment with an effect consistent, we think, with our understanding and with sufficient applicability to the present problem to be binding upon us.

In *Stratton's Independence* v. *Howbert*, 231 U. S. 399, decided December 1, 1913, the question arose under the Corporation Tax Act of 1909 whether income, which measured the tax, included the proceeds of mining operations, and the court said:

Income may be defined as the gain derived from capital, from labor, or from both combined.

See *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179. This definition has been applied to the Amendment and to the later income-tax acts under it. In *Eisner* v. *Macomber*, *supra*, the court expounded the definition so as to make it clear that the gain must be more than a mere increment or appreciation of value within the capital property. It must be "something of exchangeable value proceeding from the property, severed from the capital, however invested or em-

ployed, and coming in, being derived—that is received or drawn by the recipient [the taxpayer] for his separate use, benefit or disposal —that is income derived from property." This was said in order to demonstrate that a stock dividend was not income, although by the receipt of new certificates a stockholder might deal separately to some extent with his increment. As to stock rights, the court held similarly in *Miles* v. *Safe Deposit & Trust Co.*, 259 U. S. 247, and said:

The right to subscribe to the new stock was but a right to participate, in preference to strangers and on equal terms with other existing stockholders, in the privilege of contributing new capital called for by a corporation—an equity that inheres in stock ownership under such circumstances as a quality inseparable from the capital interest represented by the old stock, recognized so universally as to become axiomatic in American corporation law. * * *

In *Goodrich* v. *Edwards*, 255 U. S. 527, the taxable gain derived from a sale of capital assets (*Merchants Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509) was confined to the excess over original investment, despite a lower value on March 1, 1913. This was because the Constitution required it. *Lucas* v. *Alexander*, —— U. S. ——. A subsidy was held to be a capital contribution by the state and not a gain, *Edwards* v. *Cuba R. R. Co.*, 268 U. S. 628, and a mathematical gain was excluded from the definition where it was incidental to an actual loss, *Bowers* v. *Kerbaugh Empire Co.*, 271 U. S. 170. The importance of separation was manifested in *Taft* v. *Bowers*, 278 U. S. 470, holding the donee of stock who sells for a price in excess of his donor's cost taxable upon the gain. The court said:

In truth the stock represented only a single investment of capital—that made by the donor. And when through sale or conversion the increase was separated therefrom, it became income from that investment in the hands of the recipient subject to taxation according to the very words of the Sixteenth Amendment. * * *

While these several decisions deal with problems specifically different from the one at bar, they indicate a tacit recognition that income is more than mere use or enjoyment of one's own property in its original form. There must be some sort of consummated pecuniary gain from which the tax can be paid. We find no intimation that rental value of property occupied may be regarded as income any more now than at the time of the decision in the *Pollock* case.

This being inherent in the Constitution itself, Congress is precluded from broadening the meaning by legislation.

In order therefore that the clauses cited from Article I of the Constitution may have proper force and effect, save only as modified by the amendment, and that the latter also may have proper effect, it becomes essential to distinguish between what is and what is not "income," as the term is there used,

and to apply the distinction, as cases arise, according to truth and substance, without regard to form. Congress cannot by any definition it may adopt conclude the matter, since it cannot by legislation alter the Constitution from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised. (*Eisner* v. *Macomber*, 252 U. S. 189.)

It is true that Congress cannot make a thing income which is not so in fact. (*Burk-Waggoner Oil Association* v. *Hopkins*, 269 U. S. 110.)

See, also, *Taft* v. *Bowers, supra.*

The next question, assuming it to be established that rental value of space occupied by the owner may not be included in his income directly, is whether there is nevertheless the power to say that no deduction shall be allowed of taxes, expenses and depreciation unless such rental value is included in gross income. A tax upon such rental value as income without apportionment being prohibited, the inquiry is similar to that discussed in *Evans* v. *Gore*, 253 U. S. 245; *Miles* v. *Graham*, 268 U. S. 501; and *National Life Insurance Co.* v. *United States*, 277 U. S. 508. A Federal judge's salary, being protected from diminution, may not be required to be included in gross income, *Evans* v. *Gore, supra.*

If the tax in respect of his compensation be prohibited, it can find no justification in the taxation of other income as to which there is no prohibition; for, of course, doing what the Constitution permits gives no license to do what it prohibits.

\*    \*    \*    \*    \*    \*    \*

\* \* \* The taxing act directs that the compensation—the full sum, with no deduction for expenses—be included in computing the net income, on which the tax is laid. If the compensation be the only income, the tax falls on it alone; and, if there be other income, the inclusion of the compensation augments the tax accordingly. In either event the compensation suffers a diminution to the extent that it is taxed.

In *Miles* v. *Graham, supra*, applying the rule of *Evans* v. *Gore* to judges of the Court of Claims, the Supreme Court said:

No judge is required to pay a definite percentage of his salary, but all are commanded to return, as a part of " gross income " the compensation received as such from the United States. From the gross income various deductions and credits are allowed, as for interest paid, contributions or gifts made, personal exemptions varying with family relations, etc., and upon the net result assessment is made. The plain purpose was to require all judges to return their compensation as an item of " gross income " and to tax this as other salaries. This is forbidden by the Constitution.

The recent decision in *National Life Insurance Co.* v. *United States, supra*, is still more pertinent in its analogy. There, as here, the Constitution protected a subject from tax under the Sixteenth Amendment—there, interest from certain securities; here, rental value of space occupied. In both cases a deduction was limited by reason of the protected subject, the deduction there being that of 4

per cent of the reserves, and here of taxes, expenses and depreciation. The argument for the validity of the statute was made there, as here, that as the deduction was not essential, its limitation was discretionary. Without deciding whether a deduction for taxes, expenses and depreciation in respect of real estate is essential to the computation of net income where the rents received are included in the gross (cf. *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503; *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179; *United States* v. *Anderson*, 269 U. S. 422; *United States* v. *Ludey*, 274 U. S. 295), it can safely be said that it is no less so than that of a percentage of reserves to life insurance companies, and for present purposes the situation is therefore similar. We quote from the opinion:

The portion of petitioner's income from the three specified sources which Congress had power to tax—its taxable income—was the sum of these items less the interest derived from tax exempt securities. Because of the receipt of interest from such securities, and to its full extent, pursuing the plan of the statute the collector diminished the 4 per cent deduction allowable to those holding no such securities. Thus, he required petititioner to pay more upon its taxable income than could have been demanded had this been derived solely from taxable securities. If permitted this would destroy the guaranteed exemption. One may not be subjected to greater burdens upon his taxable property solely because he owns some that is free. No device or form of words can deprive him of the exemption for which he has lawfully contracted.

The suggestion that, as Congress may or may not grant deductions from gross income at pleasure, it can deny to one and give to another, is specious but unsound. The burden from which federal and state obligations are free is the one laid upon other property. To determine what this burden is requires consideration of the mode of assessment, including, of course, deductions from gross values. What remains after subtracting all allowances is the thing really taxed.

\*    \*    \*    \*    \*    \*    \*

Congress had no power purposely and directly to tax state obligations by refusing to their owners deductions allowed to others.

We are thus compelled by authority to reach the conclusion that the inclusion in gross income of rental value of space occupied by the taxpayer in its own building for tax without apportionment, as a condition of the deduction of any taxes, depreciation, or expenses, is forbidden. It should not be overlooked that the condition of paragraph (b) is not applicable alone to such amount of the deductions under (6) and (7), as compares with space occupied, but operates as a condition of such deductions in any amount in respect of the whole building. Unless the taxpayer returns as gross income the rental value of the one story occupied, it may not have any deductions whatever of the charges applicable to any part of the building, notwithstanding all rents received are returnable. The alternative given is to pay tax on gross rents received without deduction or to pay tax on net rents received plus rental value of space occupied. This, we think, is subject to at least the objection

stated by the Supreme Court in the *National Life Insurance Co.* case, and is consequently an invalid provision.

It is important, however, that the other objections to paragraph (b) should be considered, since it is quite conceivable that the foregoing may in some respect be found wanting, and the importance of an issue under the Constitution justifies a broad inquiry and requires the fullest consideration. Assuming, therefore, that the first sentence of the paragraph is beyond attack, so that true rental value of space occupied is properly required to be included in gross income, the next inquiry is as to the validity of the second sentence. By this, as has been seen, it is provided that no figure will be recognized as rental value of space occupied which is less than enough to bring about, with net rents received, a net income from the building of 4 per cent of its book value. The mathematical operation of this provision in the case at bar has been already set forth. For 1923 it brought about a figure of $14,784.70 as the rental value of one story, to be added to $73,620.48 from tenants for eleven stories; for 1924, rental value of the same one story was computed at $34,400.08 as compared with $71,289.21 received for the remainder. Although the rents received were diminished from 1923 to 1924, and the charges increased from $70,005.18 to $85,918.97, giving an apparent indication of reduced rental value of space in the building, the required formula forces an increased rental value of the story occupied to more than double. Whether this is typical of the application of the statute or unique does not appear. It is the actual situation as to this taxpayer brought about by the plain requirement of the statute, and to him it can not be said that it is an extreme illustration. As to 1924, it results in a tax based upon artificial income whereas in fact there has been a loss. Being unable to derive 4 per cent net income from the building, petitioner is nevertheless required to construct its tax return so that it will be taxed as if it did.

It seems clear that such a tax is not upon income, but its effect is to tax the realty itself, and what we have said as to the use of actual rental value in gross income is more forcibly true as to such a forced minimum. A 4 per cent income from an insurance building may approximate an actual or average return (and we should perhaps assume that Congress so regarded it), but it is not true income within the Sixteenth Amendment unless it has in fact been derived from the property or capital invested. To base the tax upon the assumption that it was in fact realized, irrespective of whether it was or not, is not the power granted by the Sixteenth Amendment; and since this is the only authority under which Congress assumed to act in Title II, it must fail of its purpose and be held invalid.

What we have said as to the use of the artificial 4 per cent minimum is likewise true of the use of book value as its basis. How book value in any given case may be arrived at or what it means is not set forth in the statute, and whether it has a meaning as to life insurance companies sanctioned by law does not appear. Regulations 62, issued under Revenue Act of 1921, treats the accounts of life insurance companies as uniform. But bookkeeping entries are not conclusive, *Doyle* v. *Mitchell, Bros. Co., supra*, and the book value of property is not to be taken as actual value, *Virginia* v. *West Virginia*, 238 U. S. 202. Thus to take book value as the standard upon which the percentage return is to be measured is to depart from fact, and just so far to define income beyond its true bounds. And we say this, even assuming that the particular book value represents actual cost with proper adjustments for wear and tear, etc., for if the investment has proved ill-advised, the actual value may be far below cost and a 4 per cent return on book value may be impossible to derive.

It is urged that the book value represents actual value where books are correctly kept. This is not necessarily true, as books may be said to be correctly kept, in a sense, when they truly state the items set forth. But cost carried forward may not be the same as present value. Despite repairs and renewals, a suitable allowance for depreciation may not have been made. It would be too much to say that there is any controlling presumption * * *.

\*          \*          \*          \*          \*          \*          \*

On the other hand, in the absence of a more complete showing with respect to the physical property and its condition, the expenditures for maintenance and the extent of depreciation, it is wholly impossible to say that the book cost represented the actual value at the time to which the inquiry was addressed. Book cost, as we have said, would be a more or less doubtful criterion. (*Virginia* v. *West Virginia*, 238 U. S. 202.)

Thus we are driven to the conclusion, despite the presumption to the contrary, that paragraph (b), although correctly construed and applied by respondent, invades this petitioner's Constitutional rights.

Our decision, therefore, is that the deficiency is invalid in so far as it results from the inclusion in gross income of any figure representing rental value of the space occupied by petitioner in its building.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

___

MARQUETTE, dissenting: The opinion herein holds that " the respondent has correctly construed the statute and that the deficiencies determined are in accordance therewith." When the Board reaches such a conclusion I believe it has exhausted its powers, except to enter a judgment for the respondent. The opinion proceeds, how-

ever, to discuss the constitutionality of the statute and reaches the conclusion that it is unconstitutional. This, in my opinion, is a clear usurpation of a judicial function not possessed by this Board. I have had occasion heretofore, in *Henry Cappellini*, 14 B. T. A. 1269, to express the idea that the power to declare an act of Congress unconstitutional is exclusively a judicial function; that no part of the judicial power of the United States, in a constitutional sense, is vested in this Board, and that the Board is without power to approach such a question. I am still of the same opinion. However persuasive the reasoning may be, or however logical the conclusion, it offers no excuse for the exercise of a power which we do not possess. It seems to me that such a pronouncement is binding on no one, and I believe the respondent is entitled to collect the deficiency as determined by him.

Morris and Van Fossan agree with the above dissent.